Josephine GRECI, Plaintiff-Appellant,

v.

John A. BIRKNES, Jr., et al.,
Defendants-Appellees.

No. 75–1338.

United States Court of Appeals,
First Circuit.

Argued Oct. 8, 1975.

Decided Jan. 9, 1976.

William A. Brown, Asst. U. S. Atty., Chief Civ. Div., with whom James N. Gabriel, U. S. Atty., was on motion for summary disposition and memorandum in support thereof for appellee.

Robert G. Clark, III, Brockton, Mass., for appellant.

Before COFFIN, Chief Judge, ALD-RICH and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Josephine Greci[1] is charged by the Italian State Attorney of Syracusa, Italy, with the murder of Gioacchino Nardone in Syracusa on the night of October 23, 1972. Greci is a naturalized citizen of the United States and a resident of Boston, Massachusetts. On October 23 and for the preceding eight or nine months, she had been living in Syracusa in a flat beneath that of her sister. On the morning of October 24, she returned by air to Boston.

In February 1973 the Italian State Attorney issued a warrant for Greci's arrest, and in August the Italian Embassy in Washington submitted a formal request, supported by documentation, for extradition under the 1868 Convention between the United States and Italy, 15 Stat. 629, *as amended by* 16 Stat. 767, 24 Stat. 1001, 61 Stat. 3687. So far as the record shows, no action was taken on this request in 1973 or 1974. In January 1975 further documentation was forwarded by the Italian authorities. On March 24, 1975, upon the sworn complaint of an Assistant United States Attorney, a United States Magistrate in Boston issued a warrant for Greci's arrest. This warrant was not based on the 1868 Convention, but on a new Treaty of Extradition between the United States and Italy (the 1973 treaty), signed on January 18, 1973, and effective March 11, 1975. On April 18 Greci was brought before another United States Magistrate for a full hearing under 18 U.S.C. § 3184.

The record is unclear whether the 1973 treaty figured in the magistrate's deliberations. While the Assistant United States Attorney thinks the magistrate may have had a copy of the new treaty at the hearing, he concedes that the parties did not and that no copy was available in any local library. While the formal order of extradition refers to the new treaty, the magistrate's opinion cites only the 1868 Convention.

Taking the standard of evidentiary competence to be that laid down in 18 U.S.C. § 3190, the magistrate ruled that all the documents submitted were "duly certified and authenticated" as required by that provision. Turning to the standard of proof, he stated that "the magistrate's only function . . . is to determine whether there is evidence to establish probable cause that the fugitive committed the crime charged." He found that while the evidence "would be insufficient to convict," it did establish probable cause.

Accordingly the magistrate on May 22 certified that the evidence warranted extradition and ordered Greci committed to federal custody. Greci promptly filed a petition for habeas corpus in the United States District Court for the District of Massachusetts. The district court denied the petition, granting summary judgment to the Government. The court agreed with the magistrate that all of the documentary evidence was admissible under § 3190 and that "it rises to the bare minimum level required for an extradition proceeding, even though so much evidence as appears in this file would not warrant a conviction under the laws of the United States."

On October 1, Greci was admitted to bail pending appeal to this court, a ruling we declined to set aside. The Government then moved for summary disposition of this appeal. After con-

---

1. Petitioner is referred to in the documents submitted by the Italian authorities as Giuseppina Greci.

sidering the record and the parties' memoranda and oral arguments, we denied the motion and called for submission of briefs addressing *inter alia* whether the 1973 treaty imposes higher standards of evidentiary competence than does 18 U.S.C. § 3190, and whether state or federal law governs the standard of proof in extradition proceedings under the treaty.

■ Review in habeas corpus proceedings is more restricted than on direct appeal, which is not available in extradition cases, *Collins v. Miller,* 252 U.S. 364, 369, 40 S.Ct. 347, 64 L.Ed. 616 (1920); *Shapiro v. Ferrandina,* 478 F.2d 894, 901 (2d Cir.), *cert. dismissed,* 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973). We are limited to deciding whether proper evidentiary standards were applied, *see Shapiro v. Ferrandina, supra,* and if so whether there was some support for the magistrate's determination, *see Fernandez v. Phillips,* 268 U.S. 311, 312, 45 S.Ct. 541, 69 L.Ed. 970 (1925).

■ We consider first whether the magistrate was right to apply the federal probable cause standard in determining if the evidence was of sufficient weight to justify extradition. Article V of the 1973 treaty provides,

"Extradition shall be granted only if the evidence be found sufficient, according to the laws of the requested Party . . . to justify his committal for trial if the offense of which he is accused had been committed in its territory . . . ."

Petitioner contends that "laws of the requested Party" refers to the laws of Massachusetts, where the hearing was held, and not to laws of the United States.[2] We disagree.

■ Treaties on extradition have commonly been interpreted as adopting state standards governing the sufficiency of the evidence to justify committal for trial, on the ground that most extraditable offenses were known only to state law. *See, e. g., Pettit v. Walshe,* 194 U.S. 205, 217, 24 S.Ct. 657, 48 L.Ed. 938 (1904).[3] However, the cases to this effect were not decided under the treaty language now before us; and the circumstances surrounding adoption of the present language[4] indicate that it was adopted in

2. While the Federal Rules of Criminal Procedure (which are not generally applicable to extradition hearings, Fed.R.Crim.P. 54(b)(5)), require only "probable cause to believe that an offense has been committed and that the defendant committed it . . .", Fed.R.Crim.P. 5.1(a), Massachusetts requires sufficient evidence to convict:

"The examining magistrate should view the case as if it were a trial and he were required to rule on whether there is enough credible evidence to send the case to the jury. Thus, the magistrate should dismiss the complaint when, on the evidence presented, a trial court would be bound to acquit as a matter of law. . . ."

*Myers v. Commonwealth,* 363 Mass. 843, 850 298 N.E.2d 819, 824 (1973).

We infer from their comments that both the magistrate and the district court would have found the evidence insufficient under the state standard.

3. Without meaning to suggest that we would depart from the now settled construction of earlier treaty language, were such language before us, we note that the reason for that construction has less force today, when the federal courts have their own rules of criminal

procedure. *See Application of D'Amico,* 185 F.Supp. 925, 930 n.6 (S.D.N.Y.), *appeal dismissed,* 286 F.2d 320 (2d Cir. 1960), *cert. denied,* 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1254 (1961).

4. Both sides on appeal quote extensively from records of the negotiating history of the 1973 treaty furnished by Knute E. Malmborg, Assistant Legal Advisor for Management of the Department of State. Mr. Malmborg, we gather from the briefs, was a participant in the negotiations and now has custody of the records. The records include early versions of Articles V and XI, minutes of the United States Delegation from two negotiating sessions, in 1969 and 1970, and a memorandum prepared by the State Department and dated May 1, 1970. While each brief includes some portions of the records that are ignored by the other, neither side has challenged the accuracy or authenticity of the other's submissions. Under the circumstances, we take judicial notice of these records as authoritative "legislative" facts, *see* McCormick on Evidence, §§ 331, 333 (2d ed. 1972), and rely on them for the history of the treaty, *see Factor v. Laubenheimer,* 290 U.S. 276, 294–95, 54 S.Ct. 191, 78 L.Ed. 315 (1933).

order to replace the traditional state standard with a federal one.

The original version of Article V of the 1973 treaty provided that sufficiency would be determined according to the "laws of the place where the person sought shall be found," language similar to that in the 1868 Convention. In the 1970 negotiating session, the Italian delegation insisted that this be changed to "laws of the requesting Party." Both delegations appear to have been aware of cases construing the discarded language to refer to state law, *e.g.*, *Pettit v. Walshe, supra; Shapiro v. Ferrandina, supra;* both appear to have contemplated that the change would ensure that this construction not be carried forward and that uniform federal law be applied.[5] Both this history and the import of the language itself lead us to conclude that the magistrate was right to have invoked the federal probable cause standard in deciding whether the evidence was sufficient to warrant extradition.

■ We turn now to the question whether the magistrate properly viewed 18 U.S.C. § 3190 as the sole guide to evidentiary competence. This section provides,

"Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated in the manner required."

Petitioner concedes that all of the materials submitted by the Italian authorities through the United States Ambassador comport with the requirements of § 3190, in that the Ambassador certified that the materials were admissible for similar purposes by Italian tribunals. She contends, however, that Article XI of the new treaty imposes more restrictive standards of competence and that these are not satisfied by the submissions. Article XI provides,

"The warrant of arrest and deposition or other evidence, given under oath, . . . shall be admitted in evidence in the examination of the request for extradition when . . . they bear the signature or are accompanied by the attestation of a judge, magistrate or other official or are authenticated by the official seal of the Ministry of Justice and, in any case, are certified by the principal diplomatic or consular officer of the United States in Italy . . . . Any deposition or other evidence which has not been given under oath but which otherwise meets the requirements set forth in this paragraph shall be admitted in evidence as a deposition or evidence given under oath when there is an indication that the person, prior to deposing before the judicial authorities of the requesting Party, was informed by those authorities of the penal sanctions to which he would be subject in the case of false or incomplete statements."

Focusing on the requirement that depositions and other evidence be "given under oath" or bear an indication that the person whose words appear was warned of the penal consequences of false or incomplete statements, petitioner contends

---

5. The minutes of the second negotiating session state,

"The Italian delegation requested deletion of the phrase 'place where the person sought shall be found'. The delegation argued that this could create an inference that the law on which extradition would be granted could depend on the state in the United States where the individual was found as opposed to the general law. . . ."

This excerpt from the minutes appears in a letter from Mr. K. E. Malmborg, included as an appendix to the Government's brief. *See* note 4 *supra.*

that the treaty goes beyond the authentication requirement of § 3190 and that notwithstanding the certification that the documents could be received for similar purposes in Italy most if not all of the documents were inadmissible to support extradition for failure to show either an oath or a warning.[6] The Government, on the other hand, argues (with support from the State Department[7]) that the negotiating history of the treaty shows no intent to go beyond any of the requirements of § 3190.

While the views of the State Department are entitled to respect, *see Factor v. Laubenheimer*, 290 U.S. 276, 295, 54 S.Ct. 191, 78 L.Ed. 315 (1933), its interpretation is in this instance contrary to both the plain language of the treaty and the available history. The requirement that depositions or other evidence be "given under oath," which was in the initial draft of the treaty, is not ambigu-

ous. The alternative provision for warnings, which was later requested by Italy, reveals awareness that the requirement of an oath would restrict the materials that could be considered.[8] The conflict with § 3190 is patent: both sides agree that at least on its face that provision permits consideration of evidence neither sworn to nor made pursuant to warnings, *cf. Sayne v. Shipley*, 418 F.2d 679, 685 (5th Cir. 1969). Under the circumstances the treaty, being both more recent and more specific than the statute, provides the controlling requirements.[9]

In view of this ruling on the controlling effect of the 1973 treaty, we think it best to return the matter of Miss Greci's extradition to the magistrate for his reconsideration, at which time he may consider the competency and sufficiency of the documents in light of the 1973 treaty and our opinion; may receive ad-

---

6. The Ambassador's 1975 certificate as to these documents followed the language of § 3190 in certifying that:

"the annexed papers, being certified copies, with translation, of judiciary documents and affidavit of witnesses . . . are properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the Republic of Italy, as required by [18 U.S.C. § 3190]."

We assume that the Ambassador's certificate is entitled to great weight even under the provisions of the treaty. But unless it can be shown that to be "properly and legally authenticated" for receipt in Italian tribunals, the testimony in the described documents would have had to be under oath or warning, this certification falls short of demonstrating compliance with the oath or warning requirement of the 1973 treaty.

7. In the letter relied on by the Government, *see* notes 4, 5, *supra*, Mr. Malmborg, states, "There is nothing in the words of Article XI which would indicate any purpose to substitute a new standard of admissibility for that provided by 18 U.S.C. 3190. As a participant in the negotiations it is not my understanding that there was any intention to change the law in this respect . . . ."

8. The minutes from the first negotiating session reveal that the Italian delegation would not agree to Article XI with the oath requirement standing alone. The United States delegation agreed to prepare a memorandum on the subject of procedural requirements of United States extradition law. This memorandum states the understanding of the United States delegation that "[t]he evidence on which a finding of probable cause may be based should include, but need not be limited to, direct evidence, in that the person who gives it must have personal knowledge of the facts he states, and it must be given under oath or be affirmed. . . . ." The minutes from the second session show that the Italian delegation explained the warning procedure used in that country in lieu of oaths or affirmation, and that the United States delegation agreed to accept that procedure as an alternative to the oath requirement. *See* note 4 *supra*.

9. *Iriarte v. United States*, 157 F.2d 105, 108 (1st Cir. 1946), *cert. denied*, 335 U.S. 816, 69 S.Ct. 36, 93 L.Ed. 371 (1948); *see Whitney v. Robertson*, 124 U.S. 190, 194, 8 S.Ct. 456, 458, 31 L.Ed. 386 (1888):

"By the constitution, a treaty is placed on the same footing, and made of like obligation, with an act of legislation. Both are declared by that instrument to be the supreme law of the land, and no superior efficacy is given to either over the other, When the two relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either; but, if the two are inconsistent, the one last in date will control the other . . . ."

ditional or corroborative documents, if such are deemed necessary; and may take account of any other matter deemed pertinent. While none of the present documents bears on its face an indication of oath or warning, we do not foreclose a finding by the magistrate, based on Italian law (*see, e. g.,* note 6 *supra*) or supplementary proof, that some or all of these documents in fact satisfy treaty standards.[10] In any event, this is a determination vested primarily in the magistrate.

Following Judge Friendly's lead in *Shapiro v. Ferrandina, supra,* 478 F.2d at 914, we remand to the district court, with directions that it order the discharge of petitioner unless a magistrate designated under 18 U.S.C. § 3184, after proceedings consistent with this opinion, certifies within 45 days that the competent evidence then before him warrants petitioner's extradition. If the magistrate so certifies, the district court shall thereupon dismiss the petition, except it may entertain renewal thereof for adequate cause. The district court shall retain continuing authority over bail and its termination.

*So ordered.*

10. We leave it to the magistrate to decide, for example, whether any of the documents is saved by a subsequent confirmatory statement that complies with Article XI.